IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PERMASTEELISA CS CORP., | : | |
| Plaintiff, | : | Case No. 2:06-cv-569 |
| v. | : | Judge Holschuh |
| THE AIROLITE CO., et al., | : | Magistrate Judge Kemp |
| Defendants. | : | |
| | : | |

<u>MEMORANDUM OPINION & ORDER</u>

Plaintiff Permasteelisa CS Corporation ("Permasteelisa") filed suit against The Airolite
Company, LLC ("Airolite") and Norman L. Murray, former president of The Airolite Company
("TAC").  Plaintiff alleges that Defendants caused TAC's assets to be fraudulently transferred to
Airolite in order to render TAC judgment-proof.  Plaintiff now seeks to void the transfer of
assets to satisfy a $707,666.35 judgment awarded by the United States District Court for the
Southern District of New York in a breach of warranty action.  The Court's jurisdiction is based
on diversity of citizenship.  <u>See</u> 28 U.S.C. § 1332(a)(1). This matter is currently before the Court
on motions for summary judgment filed by Airolite (Record at 40) and Murray (Record at 41).

I.      **Background and Procedural History**

Permasteelisa contracted with Turner Construction Company to perform curtainwall
work on a 38-story building in New York City.  Permasteelisa entered into a subcontract with
TAC, a manufacturer of architectural louvers which allow air flow but filter out dirt, debris and
water.  Shortly after the louvers were installed, the owner of the building reported problems with
rattling and fluttering noises.  In September of 2003, Permasteelisa notified TAC of the

complaints and demanded that TAC remedy the problem, but TAC did nothing.  In December of 2003, Permasteelisa threatened to sue, but TAC still refused to fix the problem.

By then, TAC was in financial distress.  Norman Leight Murray, TAC's president, who had personally guaranteed a large loan made to TAC by People's Bank, decided to sell TAC's assets so that he could avoid foreclosure on that note.  He hired Lazear Capital Partners to contact potential buyers.  Early in February of 2004, after discussions with a couple of other companies broke down, Lazear approached Gary Stroyny of Greenheck Fan Corporation, one of TAC's indirect competitors.  In order to maximize the price Greenheck might be willing to offer, Lazear framed it as a competitive bid situation and did not disclose the fact that People's Bank was foreclosing on TAC's loan.  That summer, Greenheck and TAC reached an agreement. Greenheck established Airolite, a subsidiary, for the purpose of continuing TAC's business operations.  Airolite agreed to purchase most of TAC's assets, its brand name, and goodwill for a total of $1,572,460.97.   Airolite also agreed to assume liability for an office equipment lease.  In addition, Airolite agreed to hire Murray as a sales director and increased his salary.  Airolite also hired more than twenty other key TAC employees.

Meanwhile, Permasteelisa, which knew nothing of TAC's financial difficulties or of the negotiations with Greenheck, undertook repairs on the architectural louvers at its own expense. It then attempted to recoup the costs from TAC.  At one point, TAC offered $175,000 to settle the matter, but Permasteelisa rejected the offer.  On July 26, 2004, Permasteelisa filed a breach of warranty suit against TAC in the United States District Court for the Southern District of New York, Case No. 04CV05796 (AKH), to recover the costs it had incurred, hereafter referred to as the underlying action.

TAC finalized its asset purchase agreement with Airolite just one week later, on August 2, 2004.  TAC disclosed Permasteelisa's pending claim during the negotiation process, but Airolite did not assume liability for that claim.  The purchase agreement did, however, contain an escrow provision whereby $150,000 of the purchase price was placed in an escrow account for six months to satisfy any potential warranty claims against TAC.[1]  Because it had sold its brand name to Airolite, TAC immediately changed its name to Floh Corporation.  Following the asset purchase, Floh used $1,380,780.87 of the $1,572,460.97 cash payment to satisfy TAC's outstanding secured debt.  The remainder of the proceeds, along with proceeds from the sale of TAC's real estate, collection of accounts receivable, and the sale of equipment excluded from the asset purchase agreement, went to pay unsecured creditors.  Permasteelisa received no money.

Permasteelisa did not learn of the existence of the asset purchase agreement until August 18, 2005, when it deposed Murray in the underlying action.  Permasteelisa moved for summary judgment on its claim in the underlying action and, on April 3, 2006, the United States District Court for the Southern District of New York entered judgment against Floh Corporation in the amount of $707,666.35.  There were, however, few remaining assets with which to satisfy the judgment.[2]

---

[1]  After the six-month period expired, the money was supposedly returned to TAC.

[2]  During Murray's deposition on April 16, 2007, Permasteelisa learned that Floh still had a small amount of money in its checking account.  Permasteelisa later received a check for $8,462.65 to be applied toward the outstanding judgment.

3

Therefore, on July 26, 2006, Permasteelisa filed this lawsuit against Airolite and Murray. A four-count amended complaint was filed on June 8, 2007.  Count I alleges a fraudulent conveyance of assets from TAC to Airolite in violation of Ohio's Uniform Fraudulent Transfer Act ("UFTA"), Ohio Revised Code Chapter 1336.  Plaintiff alleges that TAC entered into the asset purchase agreement with Airolite in order to render TAC judgment-proof as to Permasteelisa's pending claim.  Plaintiff contends that because Defendants acted with the intent to defraud, the Court should void the conveyance and order Airolite to pay the $707,665.35 outstanding judgment.

Count II asserts a claim of successor liability against Airolite.  Plaintiff alleges that because Airolite did not acquire TAC's assets in good faith, Airolite should be held liable as TAC's successor company for the outstanding judgment.  Count III asserts a fraudulent conveyance claim against Murray and seeks to hold him personally liable for the outstanding judgment.  Count IV alleges that the asset purchase agreement operates as a *de facto* merger between TAC and Airolite, rendering Airolite liable for the outstanding judgment.  Airolite has moved for summary judgment on Counts I, II, and IV.  Murray has moved for summary judgment on Count III.

## II.    Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the
> discovery and disclosure materials on file, and any affidavits show
> that there is no genuine issue as to any material fact and that the
> movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress

& Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." <u>Kendall v. Hoover Co.</u>, 751 F.2d 171, 174 (6th Cir. 1984).  <u>See also</u> <u>Anderson</u>, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  <u>See also</u> <u>Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  <u>Hall v. Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

III.    **Analysis**

Counts I and III of the Amended Complaint allege that Defendants Airolite and Murray engaged in a fraudulent conveyance in violation of Ohio Revised Code § 1336.04(A)(1), part of the Ohio Uniform Fraudulent Transfer Act ("UFTA").  Counts II and IV seek to hold Airolite liable for TAC's debts under theories of successor liability and *de facto* merger.  Defendants have moved for summary judgment on all claims.

A.    **Counts I and III: Fraudulent Conveyance**

1.    **Relevant Law**

Ohio Revised Code § 1336.04(A)(1) provides that "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made . . . if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  In order to succeed on its claim of a fraudulent conveyance under this subsection of the statute, Plaintiff must establish by clear and convincing evidence:  (1) a conveyance; (2) made with actual intent to defraud, hinder, or delay; (3) present or future

creditors.  See Atlantic Veneer Corp. v. Robbins, 4th Dist. No. 01CA678, 2002-Ohio-5363, at ¶

13; Blood v. Nofzinger (2005), 162 Ohio App. 3d 545, 2005-Ohio-3859, 834 N.E.2d 358, at ¶

34.

       With respect to the second element, "[b]ecause proving a debtor's actual intent to defraud

is difficult, the party alleging fraud may demonstrate actual fraud by producing clear and

convincing evidence of the 'badges of fraud' found in R.C. 1336.04(B)(1)-(11)."  Atlantic

Veneer, 2002-Ohio-5363, at ¶ 14.  That statute provides:

> In determining actual intent under division (A)(1) of this section,
> consideration may be given to all relevant factors, including, but
> not limited to, the following:
>
> (1) Whether the transfer or obligation was to an insider;
>
> (2) Whether the debtor retained possession or control of the
> property transferred after the transfer;
>
> (3) Whether the transfer or obligation was disclosed or concealed;
>
> (4) Whether before the transfer was made or the obligation was
> incurred, the debtor had been sued or threatened with suit;
>
> (5) Whether the transfer was of substantially all of the assets of the
> debtor;
>
> (6) Whether the debtor absconded;
>
> (7) Whether the debtor removed or concealed assets;
>
> (8) Whether the value of the consideration received by the debtor
> was reasonably equivalent to the value of the asset transferred or
> the amount of the obligation incurred;
>
> (9) Whether the debtor was insolvent or became insolvent shortly
> after the transfer was made or the obligation was incurred;
>
> (10) Whether the transfer occurred shortly before or shortly after a
> substantial debt was incurred;

8

> (11) Whether the debtor transferred the essential assets of the
> business to a lienholder who transferred the assets to an insider of
> the debtor.

Ohio Revised Code § 1336.04(B).

If a plaintiff proves a sufficient number of "badges of fraud," an inference arises that the

transfer was made with actual intent to defraud. Ohio courts have held that actual fraudulent

intent may be established by proving as few as three "badges of fraud." The burden then shifts

to the defendant to prove that the transfer was not fraudulent. Blood, 2005-Ohio-3859, at ¶ 49

(citing Baker & Sons Equip. Co. v. GSO Equipment Leasing, Inc. (1993), 87 Ohio App. 3d 644,

650, 622 N.E.2d 1113). The inference of actual intent to defraud may be rebutted by a showing

that the transfer was made in good faith and that the transferee paid reasonably equivalent value.

Id. at ¶ 50. By statute, "[a] transfer . . . is not fraudulent under division (A)(1) of section 1336.04

of the Revised Code against a person who took in good faith and for a reasonably equivalent

value." Ohio Revised Code § 1336.08(A)

## 2.    Analysis

Defendants argue that they are entitled to summary judgment on Plaintiff's fraudulent

conveyance claims for two reasons. First, they argue that because TAC's assets were

encumbered by perfected security interests, the conveyance is not subject to UFTA. Second,

they argue that because Airolite purchased TAC's assets for reasonably equivalent value, the

transfer, as a matter of law, is not a fraudulent conveyance. For the reasons stated below, the

Court rejects both of these arguments.

### a.    Asset Purchase Agreement is Subject to UFTA, but Plaintiff's Potential Recovery is Capped at $191,680.10

Defendants first argue that because, at the time of the transfer, TAC's assets were

9

encumbered by perfected security interests, the asset purchase agreement is not subject to UFTA. That statute prohibits fraudulent transfers. A "transfer" is defined as a "method of disposing of or parting with an asset or an interest in an asset." Ohio Revised Code § 1336.01(L). An "asset" is defined as "property of a debtor," but does not include "property to the extent it is encumbered by a valid lien." Ohio Revised Code § 1336.01(B)(1). A "valid lien" is defined as one that is "effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." Ohio Revised Code § 1336.01(M). Generally, a "valid lien" equates to a perfected security interest. See Longo Constr., Inc. v. ASAP Tech. Servs., Inc. (2000), 140 Ohio App. 3d 665, 673, 748 N.E.2d 1164, 1170 (citing Comer v. Calim (1998), 128 Ohio App.3d 599, 604, 716 N.E.2d 245, 248-249).

Defendants' argument is based on a faulty interpretation of the statutory definition of "asset." As noted above, an "asset" does not include "property *to the extent it is encumbered by a valid lien*." Ohio Revised Code § 1336.01(B)(1) (emphasis added). Defendants construe this to mean that if the property is even partially encumbered by a valid lien, the transfer of that property is exempt from UFTA. Defendants argue that because, at the time of the conveyance, at least four entities had perfected security interests in TAC's property, the transfer is not subject to UFTA.

Ohio courts have consistently rejected the interpretation advanced by Defendants. See Atlantic Veneer, 2002-Ohio-5363, at ¶¶ 29-32 (holding that because the house was worth $52,500 more than the amount of the lien at the time of the transfer, it was an asset and the transfer was subject to UFTA); Stephens v. CTI Audio, Inc., 2d Dist. No. Civ.A.1641, 2004-Ohio-6880, at ¶ 17 (rejecting the argument that because the property was partially encumbered

10

by a valid lien, it did not constitute an "asset" and its transfer was not subject to UFTA); In re McFarland, 170 B.R. 613, 623 (Bankr. S.D. Ohio 1994) (holding that because the value of the property exceeded the value of the valid liens at the time of the transfer, there was a transfer of "assets" within the meaning of Ohio Revised Code § 1336.01(B)(1)).

In support of their argument, Defendants cite to Baker, 87 Ohio App. 3d 644, 622 N.E.2d 1113. Baker, however, is clearly distinguishable. In that case, the value of the encumbrances exceeded the value of the transferred property. The court understandably found that there were no "assets," and that the transfer, therefore, was not subject to UFTA. Id. at 652, 622 N.E.2d at 1119. Here, in contrast, TAC received $1,572,460.97 in proceeds from the sale but needed only $1,380,780.87 to pay the valid liens of secured creditors. In other words, the property transferred had some remaining value out of which Permasteelisa could have realized a portion of its claim. Because the value of TAC's property at the time of transfer exceeded the value of the encumbrances by $191,680.10, the transfer is subject to UFTA.

This brings us to the question of whether, if Plaintiff succeeds on its claims, recovery would be capped at $191,680.10, the value of TAC's "assets" at the time of the conveyance. The remedies portion of UFTA states that, "subject to the limitations in section 1336.08 of the Revised Code," if a transfer is found to be fraudulent, a creditor may obtain "avoidance of the transfer . . . to the extent necessary to satisfy the claim of the creditor." Ohio Revised Code § 1336.07(A)(1). Ohio Revised Code § 1336.08(B)(1) states, "to the extent a transfer is voidable in an action by a creditor . . . under division (A)(1) of section 1336.07 of the Revised Code, the creditor . . . may recover a judgment for the value of the asset transferred, as adjusted under division (B)(2) of this section, or the amount necessary to satisfy the claim of the creditor . . . ,

whichever is less."[3]  Division (B)(2) states that if the judgment "is based upon the value of the asset transferred, the judgment shall be in an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require."  Ohio Revised Code § 1336.08(B)(2).

In applying these statutory sections to the facts of this case, Plaintiff argues that if the Court voids the conveyance, Plaintiff is entitled to recover the entire $707,666.35 judgment -- the "amount necessary to satisfy the claim of the creditor" -- because that is less than "the value of the asset transferred," the $1,572,460.97 TAC received from the proceeds of the sale of assets. Plaintiff overlooks the fact that, as noted earlier, the statutory definition of "asset" excludes property "to the extent it is encumbered by a valid lien."  Ohio Revised Code § 1336.01(B)(1). Because TAC's property was encumbered by valid liens totaling $1,380,780.87, TAC's "assets" were valued at only $191,680.10 at the time of the transfer.  Therefore, because the value of the asset transferred is less than the amount necessary to satisfy the creditor's claim, Plaintiff's potential recovery is capped at $191,680.10.

Equitable considerations dictate the same result.  Even if the transfer was fraudulent, it would not be fair to allow Permasteelisa to leapfrog over other creditors who had perfected security interests in TAC's property.  See e.g., U.S. Fidelity & Guar. Co. v. J. United Elec.

––––––––––––––––––––

[3]  In his reply brief, Murray argues for the first time that because he is not the "transferee," no judgment can be entered against him.  However, the applicable statute states that judgment may be entered against "the first transferee of the asset or the person for whose benefit the transfer was made."  Ohio Revised Code § 1336.08(B)(1).  Although he was not the first transferee, it could certainly be argued that the transfer was made for his benefit.  He sought to sell TAC's assets so that he could pay off the debt to People's Bank and avoid being held personally liable on the loan.  Moreover, the asset purchase agreement was conditioned on his continued employment.

Contracting Corp., 62 F. Supp. 2d 915, 925 (E.D.N.Y. 1999) ("creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance.").[4]

> **b.    Airolite's Payment of Reasonably Equivalent Value Does Not Necessarily Bar Plaintiff's Claims**

As noted earlier, to succeed on its claim under UFTA, Plaintiff is required to establish by clear and convincing evidence: (1) a conveyance; (2) made with actual intent to defraud, hinder, or delay; (3) present or future creditors.  See Atlantic Veneer, 2002-Ohio-5363, at ¶ 13.  It is undisputed that TAC transferred its assets to Airolite, and that Plaintiff was a "present or future creditor."  With respect to the second element, Plaintiff maintains that can establish six of the eleven "badges of fraud," creating a presumption that Defendants acted with actual intent to hinder, delay or defraud, and shifting the burden to Defendants.[5]

---

[4]  Plaintiff's citation to Atlantic Veneer is inapposite.  There, the court voided a fraudulent transfer of assets so that the judgment creditor could recover its $250,000 judgment against Natalie Robbins.  The court found that Robbins and her husband had transferred title of their house, worth $292,000 but subject to a $240,000 mortgage, to an irrevocable trust in order to defraud the creditor.  Plaintiff notes that the court did not limit recovery to the $52,000 in equity the Robbins had in their home.  Plaintiff neglects to note, however, that the fraudulent transfer included more than just the house.  Natalie Robbins had also fraudulently transferred 100 shares of stock in Natalie K. Robbins, Inc., a company in which she was the sole shareholder, to the trust and another 100 shares to her husband.  Although Ms. Robbins argued that the stock had no value and the company had no assets, the court noted that, within one year following the transfer, the company had somehow acquired assets worth $589,807.  In order to fully satisfy the judgment creditor's claim, the trial court pierced the corporate veil to reach those additional assets.  2002-Ohio-5363, at ¶¶ 8-10.  The court did not, as Plaintiff suggests, allow the judgment creditor's claim to take priority over that of the mortgage holder who presumably had a perfected security interest.

[5]  Specifically, Plaintiff argues that: (1) Defendants concealed the existence of the asset purchase agreement; (2) Plaintiff threatened suit eight months before the transfer was made; (3) the purchase agreement conveyed substantially all of TAC's assets; (4) TAC concealed other assets, including outstanding accounts receivable; (5) TAC became insolvent as a result of the

Defendants argue that even if Plaintiff can establish a presumption of fraud, Defendants are nevertheless entitled to summary judgment based on the affirmative defense set forth in Ohio Revised Code § 1336.08(A). As noted above, that section provides, "[a] transfer . . . is not fraudulent under division (A)(1) of section 1336.04 of the Revised Code against a person who took in good faith and for a reasonably equivalent value." Defendants contend that because Airolite paid reasonably equivalent value for TAC's assets, the transfer was not a fraudulent transfer under § 1336.04(A)(1), and Plaintiff's claims must be dismissed. Because this is an affirmative defense, Defendants bear the burden of proof. See Uniform Fraudulent Transfer Act § 8 cmt. 1 (1984) ("The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged.").

Airolite's expert, Heinz Ickert, a certified business valuation analyst, testified that the asset purchase agreement was an arm's length transaction and that Airolite purchased TAC's assets for a reasonably equivalent value. (Ickert Dep. at 44-48, 57; Ex. D to Airolite's Mot. Summ. J.). Plaintiff has offered no expert testimony to the contrary. Plaintiff argues, however, that it is not enough that Airolite shows that it paid reasonably equivalent value for TAC's assets. Defendants must also prove that they acted in good faith. Plaintiff contends that genuine issues of material fact preclude summary judgment on this issue. The Court agrees.

The plain language of the statute requires both elements. Moreover, common sense dictates that a transferee should not be able to avoid liability simply by paying a reasonably equivalent value for the assets. If the transferee has actual or constructive knowledge that the

_____

purchase agreement; and (6) the transfer occurred just one week after Plaintiff filed suit against TAC.

14

debtor is making the conveyance with intent to hinder, delay or defraud a creditor, the payment of a reasonably equivalent value does not, and should not, absolve the transferee of wrongdoing. See Ford v. Star Bank, N.A., 4th Dist. No. 97CA39, 1998 WL 553003, at *4 (Ohio Ct. App. Aug. 27, 1998) (holding that transferee's fraudulent intent is not required to establish fraudulent conveyance claim, but is relevant in establishing the good faith defense set forth in § 1336.08(A)); Gevedon v. Ivy, 2d Dist. No. 19893, 2003-Ohio-6521, at ¶ 21 (holding that on remand, if court finds the conveyance fraudulent despite the fact that reasonably equivalent value was paid, the court should take appropriate action); K-Swiss, Inc. v. Cowens Sports Center, Inc., No. 95-CA-48, 1995 WL 655945, at *10 (Ohio Ct. App. Nov. 8, 1995) (holding that even if the transferee paid a reasonably equivalent value, the parties had "engaged in the transaction with the deliberate intent to frustrate creditors" and did not demonstrate the requisite good faith).

In support of their argument that the payment of reasonably equivalent value, in and of itself, demonstrates good faith and that no more need be shown, Defendants rely primarily on Baker. There, the court stated, "[w]hen GSO Equipment presented evidence indicating it paid reasonably equivalent value for the assets transferred, it rebutted the inference of fraud and shifted the ultimate burden of proof back to Baker." Baker, 87 Ohio App. 3d at 651, 622 N.E.2d at 1118-19. Airolite also cites to the unpublished case of Burton v. Triplett, 10th Dist. No. 01AP-357, 2002-Ohio-580, in which the court, citing Baker, stated in passing that "the payment of reasonably equivalent value, even if the intent to defraud could be said to exist, is an affirmative defense to a claim under R.C. 1336.04."[6]

_____

[6] Airolite also cites to Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp., 237 B.R. 322, 331 (6th Cir. 1999), but that case is inapposite because it interpreted a prior statute, the Ohio Uniform Conveyances Act.

Viewed in isolation, these statements could admittedly be construed to mean that the payment of reasonably equivalent value is all that is needed.  However, both courts acknowledged elsewhere in their opinions that § 1336.08(a) requires the transferee to demonstrate that it paid reasonably equivalent value <u>and</u> that it participated in the transfer in good faith.  <u>See</u> <u>Baker</u>, 87 Ohio App. 3d at 650-51, 622 N.E.2d at 1118; <u>Burton</u>, 2002 Ohio App. LEXIS 555, at *17.  In fact, in <u>Burton</u>, the court noted that "Plaintiff offered no evidence that defendants . . . acted in bad faith, nor did plaintiff offer any admissible evidence to rebut defendants' evidence that the property was purchased for reasonably equivalent value."  <u>Id.</u>  In this Court's view, neither <u>Baker</u> nor <u>Burton</u> stands for the proposition that payment of reasonably equivalent value, standing alone, satisfies the good faith requirement.

Having determined that Defendants must demonstrate both that Airolite paid reasonably equivalent value <u>and</u> acted in good faith, and keeping in mind that Defendants bear the burden of proof on this issue, the Court turns to the question of whether Plaintiff has presented sufficient evidence from which a reasonable jury could find a lack of good faith.

Defendants generally argue that they acted in good faith and sold TAC's assets in a manner that allowed them to maximize payments to all of TAC's creditors.  Plaintiff notes, however, that Airolite representatives knew of the pending claim against TAC prior to the date the asset purchase agreement was executed.  (Murray Aff. ¶ 8; Ex. E to Murray's Mot. Summ. J.).  In fact, the asset purchase agreement was finalized just one week after Plaintiff filed suit against TAC, and the transfer of assets rendered TAC insolvent.  Although the parties, as part of the asset purchase agreement, placed $150,000 in an escrow account to satisfy outstanding warranty claims against TAC, Airolite concealed the existence of this account from Plaintiff and,

16

upon the expiration of the six-month escrow period, Airolite allowed the escrow funds to revert

back to TAC.  (Stroyny Dep. at 78-82; Lazear Dep. at 103-04).  Plaintiff further notes that the

asset purchase agreement guaranteed future employment for Murray.  Moreover, Airolite

continued TAC's business operations and hired twenty-four other TAC employees.  (Murray

Aff. ¶ 7).  In the Court's view, based on the evidence presented, a reasonable jury could find that

Defendants did not act in good faith.  Summary judgment is therefore inappropriate.

**c.**      **Damages**

It is well established that "[a] person injured by fraud is entitled to such damages as will

fairly compensate him for the wrong suffered; that is, the damages sustained by reason of the

fraud or deceit, and which have naturally and proximately resulted therefrom." Foust v.

Valleybrook Realty Co. (1981), 4 Ohio App.3d 164, 166, 446 N.E.2d 1122.  Without injury,

however, no remedy is available.

Defendant Murray argues that even if Plaintiff can establish a fraudulent conveyance,

Plaintiff cannot prove that it suffered any compensable damages.  At the time of the asset

purchase agreement, Permasteelisa had no judgment lien and no perfected security interest.  It

was simply an unsecured creditor with a pending lawsuit.  Plaintiff speculates that if TAC had

not sold its assets to Airolite, there would have been additional money available to satisfy the

judgment, but Plaintiff fails to offer any proof.  Murray maintains that if TAC did not sell its

assets to Airolite, People's Bank would have foreclosed on its loan, forcing a liquidation of

TAC's assets.  According to Heinz Ickert, this would have resulted in even less money being

available to pay TAC's creditors.  (Ickert Dep. at 60-61; Ex. D to Airolite's Mot. Summ. J.).

However, because it is not clear *how much* less money would have been available, the Court

17

cannot, at this juncture, conclude, as a matter of law, that Plaintiff will be unable to establish the requisite injury.

For all of the reasons stated above, the Court denies Defendants' motions for summary judgment on Counts I and III, the fraudulent conveyance claims.

### B.    Count II: Successor Liability and Count IV: *De Facto* Merger

In addition to arguing that judgment should be entered against Airolite as the "transferee" in the allegedly fraudulent conveyance pursuant to Ohio Revised Code § 1336.08(B)(1)(a), Plaintiff also argues that Airolite should be held liable for the judgment entered against TAC on two common law grounds.

As a general rule, the purchaser of a corporation's assets is not liable for the seller's debts.  There are, however, four exceptions to that rule.  A successor corporation may be held liable when:

> (1) the buyer expressly or impliedly agrees to assume such liability;
> (2) the transaction amounts to a *de facto* consolidation or merger;
> (3) the buyer corporation is merely a continuation of the seller corporation; or
> (4) the transaction is entered into fraudulently for the purpose of escaping liability.

Welco Indus., Inc. v. Applied Cos. (1993), 67 Ohio St. 3d 344, 346-47, 617 N.E.2d 1129, 1132 (quoting Flaugher v. Cone Automatic Machine Co. (1987), 30 Ohio St.3d 60, 62,  507 N.E.2d 331, 334).  The second and fourth exceptions are implicated here.

### 1.    *De Facto* Merger

In Count IV of the Amended Complaint, Plaintiff alleges that the asset purchase agreement operates as a *de facto* merger between TAC and Airolite, rendering Airolite liable for

the outstanding judgment.  "A *de facto* merger is a transaction that results in the dissolution of

the predecessor corporation and is in the nature of a total absorption of the previous business into

the successor."  Welco, 67 Ohio St. 3d at 349, 617 N.E.2d at 1134. The Ohio Supreme Court has

held:

> The hallmarks of a de facto merger include (1) the continuation of
> the previous business activity and corporate personnel, (2) a
> continuity of shareholders resulting from a sale of assets in
> exchange for stock, (3) the immediate or rapid dissolution of the
> predecessor corporation, and (4) the assumption by the purchasing
> corporation of all liabilities and obligations ordinarily necessary to
> continue the predecessor's business operations.

Id.

In this case, it is undisputed that Airolite is continuing TAC's previous business activity

and hired many of TAC's previous employees, that TAC was immediately dissolved upon the

execution of the asset purchase agreement, and that Airolite purchased all assets, goodwill,

liabilities and obligations necessary to continue TAC's business operations.

Airolite contends, however, that because TAC did not sell its assets in exchange for

stock, but instead sold its assets for cash, Plaintiff cannot recover on a *de facto* merger theory.  In

Welco, the Ohio Supreme Court noted that the Seventh Circuit has held that "a transfer of assets

for stock is the *sine qua non* of *de facto* merger."  Id. (citing Travis v. Harris Corp., 565 F.2d

443, 447 (7th Cir. 1977)).  See also Kemper v. Saline Lectronics, 366 F. Supp. 2d 550, 555-56

(N.D. Ohio 2005) (citing Welco for the proposition that unless there is a stock-for-assets

transaction, Ohio will not recognize a *de facto* merger); H.C.F.. Inc. v. Ohio Bureau of Workers'

Compensation (1998), 80 Ohio St. 3d 642, 648, 687 N.E.2d 763, 768 (citing Welco, stating that

an "assets-for-stock exchange" is "arguably the *sine qua non* of a *de facto* merger.").

19

Plaintiff correctly notes, however, that the Ohio Supreme Court in <u>Welco</u> did not expressly adopt the Seventh Circuit's *sine qua non* requirement.  In <u>Cytec Industries, Inc. v. B.F. Goodrich Co.</u>, 196 F. Supp. 2d 644, 658 (S.D. Ohio 2002), the court noted that the Ohio Supreme Court has not held that all four hallmarks need be present to establish a *de facto* merger; nor has it held that an assets-for-stock transaction is always required.  It pointed out that <u>Welco</u> adopted the four hallmarks from the case of <u>Turner v. Bituminous Casualty Co.</u> (1976), 397 Mich. 406, 244 N.W.2d 873, 880, in which the Michigan Supreme Court held that "the presence of stock as consideration should be one factor to use to determine whether there exists a sufficient nexus between the successor and predecessor corporations to establish successor liability.  However, the absence of an exchange of stock should not be conclusive."  Other factors such as continuity of management, personnel, assets, and location of the business are also relevant.  <u>Cytec</u>, 196 F. Supp. 2d at 658.  Based on these cases, the Court cannot conclude, as a matter of law, that the absence of a stock-for-assets transaction is fatal to Plaintiff's *de facto* merger claim.[7]

### 2.    Fraudulent Transfer of Assets

In Count II of the Amended Complaint, Plaintiff alleges that Airolite did not acquire TAC's assets in good faith.  At the time it executed the asset purchase agreement, Airolite knew of the existence of Plaintiff's claims against TAC and knew that the agreement would render TAC insolvent.  (Am. Compl. ¶ 31).  Plaintiff contends that this fraudulent asset transfer renders

---

[7]  In the alternative, Plaintiff argues that even if a stock transfer is an indispensable requirement, that requirement is satisfied because Murray has the right to participate in Greenheck's employee stock ownership plan.  There is no need for the Court to address this argument at this juncture.

Airolite liable as TAC's successor company for the outstanding judgment.  (Id. at ¶¶ 33-34).

Airolite maintains that it is entitled to summary judgment on this claim because there is no evidence that the transaction was fraudulent; it was an arms-length transaction designed to maximize payment to all of TAC's creditors.  Plaintiff argues that because it has presented sufficient evidence of several "badges of fraud" and evidence from which a jury could reasonably conclude that Airolite did not act in good faith, genuine issues of material fact preclude summary judgment on Count II.  For the reasons stated above in connection with Count I, the Court agrees with Plaintiff.

## IV. Conclusion

For the reasons stated above, Defendants' motions for summary judgment (Record at 40 and 41) are **DENIED**.

**IT IS SO ORDERED.**

Date: December 31, 2007                              **/s/ John D. Holschuh**
                                                    John D. Holschuh, Judge
                                                    United States District Court